UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA,

    Petitioner,

v.                                            CASE NO. 8:15-mc-2-T-23MAP

JOSEPH A. BELCIK,

    Respondent.
_____/

## AMENDED ORDER[1]

The IRS has tried for two years to obtain information from Belcik about his tax liability for the 2008-2013 tax years. And since January 2015, when the government moved to enforce the IRS's July 2014 administrative summons directed to Belcik, the Court has held seven hearings. Belcik failed to show up at three. As a consequence, the case has haltingly moved through the compliance/enforcement stage (the District Judge granted the petition and enforced the summons, prompting Belcik to at last meet with IRS revenue agents in July 2015), into the contempt phase (the District Judge found Belcik in contempt and ordered him arrested in April 2016 for failing to produce documents or otherwise meaningfully comply with the summons, failing to appear at hearings, and repeatedly filing frivolous motions), and finally into the phase we find ourselves in now: the purgation stage. With Belcik in contempt, the District Judge orally directed me to conduct an *Argomaniz* review into Belcik's

---

[1] This Amended Order corrects a scrivener's error and clarifies that the government withdrew question 40; therefore, Belcik does not have to answer it.

Fifth Amendment claims. *See United States v. Argomaniz,* 925 F.2d 1349, 1353 (11th Cir. 1991); L.R. 6.01(b), M.D. Fla.[2] At that proceeding, Belcik refused to be sworn, failed to produce any documents for me to review *in camera*, and asserted the Fifth Amendment as to every question I asked save a couple.[3] Against this backdrop I am tasked with deciding if Belcik has purged his contempt. I find that he has not.

  *A. History*

More than thirty years ago, in *United States v. Rylander*, 460 U.S. 752 (1983), the Supreme Court considered the actions of a respondent who failed to comply with an IRS summons. That respondent's summons was much like Belcik's, and, like Belcik, that respondent had ignored the district judge's orders and had failed to show up for a hearing when directed. The district judge, faced with the respondent's lengthy, frustrating course of conduct, found him in contempt and issued a warrant for his arrest – just like what happened to Belcik. *Id.* at 755. Noting that the district judge had "patiently" protected the respondent's procedural rights at every step of the process, the Supreme Court said what could be said here:

---

[2] The District Judge referred the Fifth Amendment determinations to me for disposition. *See* L.R. 6.01(b), M.D. Fla. The marshal arrested Belcik on April 21, 2016. After he retained counsel, I released Belcik on his personal recognizance on April 25, 2016. His conditions of release require him to appear at all future hearings as directed (doc. 92).

[3] The government initially identified 42 questions that Belcik should have answered (doc. 91). Later, the government conceded that questions 6, 20, 23, part of 26 (asking Belcik where he got money to buy vehicles), and 40 are protected by the Fifth Amendment.

2

> '[a] subpoena [or a summons] has never been treated as an invitation to a game of hare and the hounds, in which the witness must testify only if cornered at the end of the chase. If that were the case, then, indeed, the great power of testimonial compulsion, so necessary to the effective functioning of courts and legislatures, would be a nullity.'

*Id*. at 762 (quoting *United States v. Bryan,* 339 U.S. 323, 331 (1950)).

Two years ago, revenue agent John Clark summonsed Belcik to appear before the IRS on July 15, 2014, and "give testimony" and "produce for examination" the records in his possession, custody or control reflecting income he received for the 2008-2013 tax years (*see* doc. 1). When Belcik failed to show, the government petitioned this Court to enforce the summons under 26 U.S.C. §§ 7402(b) and 7604(a) (doc. 1-1, Clark Declaration). I set a show cause hearing for April 6, 2015 (doc. 2). Belcik, acting as his own counsel, moved to dismiss the petition (doc. 5) and moved to vacate my show cause order (doc. 6), arguing the summons was illegitimate and the Court's ability to enforce the summons against him would constitute an abuse of the Court's process. He next raised a host of frivolous objections at the hearing: the Court was without jurisdiction over him; I had no authority to issue the show cause order to enforce the summons; the United States Attorney could not bring a suit to enforce the summons; and even though he had not appeared in answer to the summons, he was nonetheless entitled to the benefits of *Miranda* and to the protections of the Fifth Amendment. I concluded that Belcik had failed to meet his burden under *United States v. Powell*, 379 U.S. 48, 57-58 (1964), or to otherwise convince me that enforcement of the

3

summons would constitute an abuse of the Court's process.[4] As a result, I reported to the District Judge and recommended to him that he enforce the summons (doc. 11). The District Judge adopted my report and recommendation, directed Belcik to pay the government's costs in prosecuting the action, and ordered Belcik to appear before revenue agent Clark or any other designated revenue agent at the date, time, and place fixed to give testimony and produce for examination and copying the books, records, papers, and other data as demanded by the July 1, 2014, summons (doc. 15). Belcik did not appeal. *See Church of Scientology of Cal. v. United States*, 506 U.S. 9, 15 (1992) (IRS summons enforcement orders are subject to appellate review).

Revenue agents personally delivered that order to Belcik with a written notice setting a May 21, 2015, date for the administrative proceeding (doc. 28-1, Clark Declaration; doc. 28-3, Clark Letter). Belcik responded with a letter to Clark warning him not to "trespass upon his property again," and "challenging his legal authority to demand any paper from [him]" (doc. 28-3, Respondent Letter). When Belcik failed to appear at the May 21 meeting, the government moved the Court to find Belcik in contempt (doc. 28). I set yet another show cause hearing, and Belcik again failed to appear (docs. 35, 39). On July 15, 2015, I reported to the District Judge and recommended he find Belcik in contempt (doc. 40).

---

[4] *Powell* requires the government to show: (1) the IRS investigation is being conducted for a proper purpose; (2) the inquiry may be relevant to the purpose; (3) the information sought is not already within the IRS Commissioner's possession; and (4) the administrative steps required by the Internal Revenue Code have been followed. 379 U.S. at 57-58.

On July 22, 2015, with my recommendation pending, Belcik met with revenue agents Clark and Daniel Itchue (the compliance meeting) (*see* doc. 47). During the almost two hour interview, Clark asked Belcik 473 questions. Belcik asserted the Fifth Amendment 355 times. Moreover, he did not produce any of the documents the summons demanded (*see* doc. 64). In view of Belcik's assertions of the Fifth Amendment on a question-by-question basis, the District Judge vacated my report recommending contempt and remanded the matter to me for an *in camera* proceeding to determine the validity of Belcik's Fifth Amendment assertions (doc. 47). I issued an order that summarized the above events and directed Belcik to appear before me on February 25, 2016, for an *in camera* hearing "to substantiate his privilege claims and for the Court to evaluate his Fifth Amendment assertions." (doc. 49). I also specifically stated I would inquire into his privilege claims (for the questions and the documents) "as dictated by the Eleventh Circuit in *Argomaniz*." (*Id*.) And further, if he failed to appear at the hearing, I would construe his failure as a waiver of the Fifth Amendment claims he asserted at the July 22, 2015, compliance meeting. (*Id*.) The government, as directed, personally served Belcik with a copy of the order (doc. 51).

For the second time, Belcik failed to appear at a duly noticed judicial proceeding (doc. 70). And, for the second time, I certified the facts and recommended to the District Judge that he hold Belcik in contempt (doc. 72). On March 4, 2016, the District Judge indeed found Belcik in contempt for "continually filing repetitive, groundless motions . . . and for failing to appear at the latest hearing before the magistrate judge," and he ordered Belcik to appear at a hearing before him on March 15 to determine the appropriate sanction

for Belcik's contempt and to assess Belcik's Fifth Amendment claims (docs. 73, 74). When Belcik failed to appear as ordered (the third judicial proceeding he missed), the District Judge issued an attachment for Belcik's arrest in accord with 26 U.S.C. § 7604 (docs. 76, 77) and then orally directed me to conduct an *Argomaniz* inquiry into Belcik's Fifth Amendment claims (for disposition). *See* L.R. 6.01(b), M.D. Fla. The marshal arrested Belcik on April 21, 2016. After Belcik secured counsel, I released him on his personal recognizance on April 25 with the condition that he appear at all future proceedings.

At the May 24, 2016, *in camera* hearing, Belcik refused to take the oath or to affirm that he would testify truthfully. *See* Fed. R. Evid. 603.[5] And his counsel indicated Belcik would interpose his Fifth Amendment privilege as to each question I asked and as to the production of any documents covered by the summons.[6] In sum, Belcik did not add any new information (namely, something more than what I can glean from Clark's affidavit supporting the petition to enforce the summons (doc. 1)); he did not present me any documents for my *in camera* inspection as I directed in my orders (docs. 49, 88); and he certainly did not particularize his Fifth Amendment claims for any document the summons sought. Instead, Belcik's position is that he has a reasonable apprehension of criminal liability based solely from the questions asked and from the documents sought.

---

[5] The purpose of the oath or affirmation, in whatever form applied, is to impress upon the witness's conscience the duty to testify truthfully. Fed. R. Evid. 603, advisory committee note to 1972 proposed rules.

[6] Before the hearing, the government narrowed its list of questions that Belcik should have answered at his compliance meeting (doc. 91).

### B. Fifth Amendment Standards

The Fifth Amendment privilege against self-incrimination "protects a person … against being incriminated by his own compelled testimonial communications." *Argomaniz,* 925 F.2d at 1352 (quoting *Fisher v. United States,* 425 U.S. 391, 409 (1976)). To successfully assert the claim, Belcik must show more than a speculative, generalized concern about a possible tax-related prosecution; instead, he must face a substantial and real hazard of self-incrimination. *Id.* at 1353. Said differently, Belcik must show he has "reasonable cause to apprehend danger" of criminal liability. *Id.* (quoting *Hoffman v. United States,* 341 U.S. 479, 486 (1951)).[7] Whether he can do so depends on the answers to two questions. *Id.* First, given Belcik's circumstances, is his hazard for self-incrimination implicit from the revenue agent's question or implicit from the particular document the summons demands; or, alternatively, would Belcik's answer to a specific question or his production of a specific document "furnish a link in the chain of evidence needed to prosecute the [him] for a federal crime"? *Hoffman*, 341 U.S. at 486. Second, did he properly invoke the privilege? *Argomaniz*, 925 F.2d at 1353. That inquiry confronts Belcik's burden for successfully asserting the Fifth Amendment. For example, a blanket invocation of the privilege will not suffice. *Id.* at 1356. Nor will an *ipse dixit* assertion of the privilege be enough. *Hoffman*, 341 U.S. at 486 ("The witness is not exonerated from answering merely because he declares that in so doing he would incriminate himself – his say-so does not of itself establish the

---

[7] The Fifth Amendment's reach extends to protect "*innocent* men who otherwise might be ensnared by ambiguous circumstances." *Ohio v. Reiner,* 532 U.S. 17, 20-21 (2001).

hazard of incrimination."). What Belcik was required to do was to adequately support his Fifth Amendment claims in an *in camera* proceeding (applying the methods outlined above) where the Court could make a "particularized inquiry" into his claims to determine their reasonableness. *Argomaniz*, 925 F.2d at 1355 (citing *United States v. Melchor Moreno,* 536 F.2d 1042, 1049 (5th Cir. 1976)). For Belcik, that meant his remedy was to bring his documents to the hearing and subject himself to the Court's inquiry as to those questions and those documents he claims are protected under the Fifth Amendment. *Id.*

    *C. Analysis*

*Argomaniz* envisions two sources of information for evaluating the context of a taxpayer's Fifth Amendment claims – the public source (that information garnered from the public file and open hearings) and the private source (that information the taxpayer presented during the *in camera* proceeding). Belcik, who refused to take the oath or to be sworn as a witness, presented no evidence during the *in camera* proceeding. He offered no explanation as to why. Neither he nor his counsel complained about the form of the oath on any religious or moral ground. Instead, Belcik, in keeping with his contumacious conduct, simply refused. Such behavior is not without consequence. A witness who refuses to take an oath or to affirm when called to testify is no witness at all. *United States v. Fowler*, 605 F.2d 181, 185 (5th Cir.1979);[8] *see also United States v. Fiore*, 443 F.2d 112, 114 (2d Cir. 1971). Belcik's

---

[8] The Eleventh Circuit in an *en banc* decision, *Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1209 (11th Cir. 1981), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

answers were therefore meaningless. As such, my only context for evaluating his Fifth Amendment response to a particular question is to consider the paucity of information in the public file and the reasonable implications that are to be drawn from that consideration.[9]

### 1. context

The government alleges Belcik has not filed tax returns since the mid-1990s. Consequently, Belcik's fears about a potential prosecution for the tax crimes of failure to file, tax evasion, and tax conspiracy are not just speculative (doc. 98 at 2). Even though the applicable statute of limitations for these crimes is six years (26 U.S.C. § 6531), which would presumably insulate Belcik from prosecution for any tax crimes occurring in 2008 and 2009 (two of the years the summons covers), Belcik nonetheless voices concerns about the tax years the statute of limitations insulates.[10] And, he says his position is reasonable because the statute of limitations serves as a defense to prosecution; it is not a rule of evidence. *United States v. Ashdown*, 509 F.2d 793, 798 (5th Cir. 1975); *see also* Fed. R. Evid. 404(b)(2). Hence, evidence of tax evasion dating back to the mid-1990s would be admissible to prove his intent for any failure to file returns after 2009. *Id.*

---

[9] Belcik's decision not to disclose privileged evidence (testimony or documents) is also not without consequence. The *in camera* proceeding afforded him the chance to provide targeted support for his Fifth Amendment claims without the loss of his privilege and without the concern of incrimination. *United States v. Zolin*, 491 U.S. 554, 569 (1989); *United States v. Bright*, 596 F.3d 683, 691(9th Cir. 2010) (had respondents wished to provide targeted support concerning the privilege they could have done so *in camera* without loss of privilege).

[10] But, for willful tax evasion, the statute of limitations does not begin running until the later date of either when the tax return was due or a defendant's last affirmative act of tax evasion. *United States v. Winfield*, 960 F.2d 970, 973-74 (11th Cir. 1992).

Accordingly, I look at each question (without really knowing the answer Belcik would give) and ask whether its implication presents Belcik with a reasonable prospect of criminal liability.[11] As for the documents the summons demanded (which *Argomaniz* and my orders instructed him to present for my review), Belcik came to the *in camera* hearing empty-handed. Instead of showing me his responsive documents or explaining to me why he could not produce the sought-after documents, Belcik made the same arguments I have already outlined. Left with this context, I address the revenue agent's questions first and then discuss the documents (or the lack thereof) and Belcik's obligations for satisfying his Fifth Amendment burdens.

      *2. questions*

         *a. Fifth Amendment applies*

Almost all the questions the revenue agent asked Belcik seek testimony about his earnings or his net worth for the 2010-2013 tax years and relate to the elements of failure to file and tax evasion. Belcik's answers to questions 1-5, 7-14, 16-17, 19, 21-22, 24-26, 28-29, 36-38, and 41 likely would reveal Belcik's income during these years. These questions are:

1. You have told the IRS "Do not come to my house or other property again . . . ." Where and what is the "other property" that you reference?

---

[11] The government has a host of tools for proving unreported income in a tax prosecution: direct evidence that the accused received income in a given year; the net worth method of proof that measures increases in the wealth of the taxpayer and compares the results with reported income; the expenditures method of proof; and the bank deposits method. *See* CRIMINAL TAX MANUAL, Dep't of Just. Manual Comment 6-1.130AI at § 8.07[6]; *see also United States v. Harvey*, 869 F.2d 1439, 1442 n.4 (11th Cir. 1989) (describing net worth method).

2. Do you own any other property than the property at Race Track Road and your residence at 1551 Eastlake Woodlands Parkway and where is it located?
3. How did you come to possess the money to acquire these properties?
4. Did you ever take out a mortgage or contract to finance your acquisition of any property?
5. If you have a mortgage instrument or contract on any property, has the debt instrument been paid in full, or, is there still a balance owed?
7. How did you come to possess the money to acquire this property at 1551 Eastlake Woodlands Parkway, Oldsmar, Florida?
8. On April 4, 1999, a warrant for unpaid State of Florida Sales Tax issued to you, in your proper given name, for $45,607.44?  Where did you get the money to pay off this warrant?
9. On April 5, 1999, a warrant for unpaid State of Florida Sales Tax issued to you, in your proper given name, for $7,645.30?  Where did you get the money to pay off this warrant?
10. On April 2, 2008, a Notice of Commencement was filed by David Wilson Homes with the Clerk of Court, Pinellas County, which can be found at Book 16203, page 494, which provides the following description: 1100 sq ft addition to 1551 Eastlake Woodlands Pkwy., Oldsmar, Fl.  How much did you pay for this addition to your home and where did you get the money to pay for it?
11. On October 17, 2008, a Claim of Lien was filed with the Clerk of Court, Pinellas County, which can be found at Book 16406, Page 1782.  This Claim of Lien was filed by Probuild East, LLC in the amount [of] $6,197.49 of unpaid advances on a $12,161.20 construction material order by David Wilson Homes, which was used to effect the contract evidenced by the Notice of Commencement filed with the Clerk of Court, Pinellas County, dated April 2, 2008.  Where did you get the money to satisfy this lien?
12. On July 23, 2001, a warranty deed was filed with the Clerk of Court, Hillsborough County, which can be found at Book 10953, Page 0994 that describes a transfer of unimproved property from Highland Inc., and John C. Landon, grantors, to Joseph A. Belcik and Kaylyn Belcik, grantee.  What consideration (money, goods or other services) id you use to purchase this property and where did you get this consideration to purchase this property?  This unimproved vacant land is known as Racetrack Road Business Park, Parcel E and 9921 Racetrack Road, Tampa, Florida?
13. On January 30, 2002, a Notice of Commencement was filed with the Clerk of Court, Hillsborough County that can be found at Book 11385, Page 1868 by Gary Halverson Inc., which describes the following service: general description of improvements, office/warehouse at Racetrack Road, Tampa, Florida.
    a. How much was the construction contract between you and Gary Halverson Inc. for this Notice of Commencement?
    b. How did you pay for this construction contract?

11

   c. Where did the money come from?
14. Do you pay for insurance for your residence or on the property at RaceTrack Road?
16. How many minor children do you support, if any?
17. When was the last time you were outside of the continental United States?
19. Where have you been or traveled to outside of the continental United States?
21. Do you now have any foreign bank accounts, meaning a financial account of any type outside of the United States and if so when was it acquired, where was it acquired and what institution?
22. Have you ever had any foreign bank accounts, meaning a financial account of any type outside of the United States and if so when was it acquired, where was it acquired and what institution?
24. The IRS received statements from banks where you have accounts. There are deposits to these accounts. These deposits are payments from others to an account you control. What is the source and purposes of these deposits?
25. How many vehicles do you own or lease, either jointly o personally?
26. What are these vehicles?[12]
28. Do you currently have a job or employment?
29. From 2008-2015, did you have a job or employment?
36. What are your hobbies?
   a. How often do you pursue them and where did you get the money to pay for these hobbies?
37. Do you keep an account at the clubhouse at Eastlake Golf Club in Oldsmar, Florida?
38. How do you pay for your personal living expenses?
41. Did your children actually receive aid, other tuition assistance or a scholarship to their respective college/university?

Likewise, Belcik's answers to questions 32 and 34-35 would help the government establish Belcik's intent to evade taxes. These questions are:

32. Why did you stop filing Federal Income Tax Returns?
34. Did something happen in 1995 that made you change your mind about filing Federal Income Tax Returns?
35. Did you file the 1993 and 1994 US Federal Income Tax returns because you were going to take out a mortgage note on residence?

Finally, Belcik's answers to questions 27, 30-31, and 33 could reveal a conspiracy.

---

[12] The government conceded that a portion of question 26 (omitted here) was protected by the Fifth Amendment.

12

These questions are:

27. Does anybody allow you to use a vehicle that is titled and registered to them, but not to you?
30. Did you ever ask anyone to hold cash for you?
31. Did anyone ever ask you to hold cash for them?
33. Did someone advise you to stop filing Federal Income Tax Returns?

Compliance with the summons as to these questions included above likely would reveal incriminating information.

As to those questions that ask about pre-2010 tax years, either directly or indirectly (a subset of the questions identified above: questions 8-13, and 29), again Belcik's answers could incriminate him. As his counsel points out, the six-year statute of limitations serves as a defense to prosecution; it is not a rule of evidence. The government could offer evidence in a criminal prosecution that Belcik has been a serial non-filer since the mid-1990s. *See United States v. Maxwell*, 643 F.3d 1096 (8th Cir. 2011) (evidence of defendant's failure to file income-tax returns during years for which the statute of limitations had run properly admitted to show a conspiracy); *United States v. Kalita*, 712 F.2d 1122, 1130-31 (7th Cir. 1983) (failure to file was probative as to willfulness). Accordingly, compliance with the summons as to the questions asking about his pre-2010 income likely would reveal incriminating information.

The second prong of the *Argomaniz* test requires me to decide if Belcik properly invoked his Fifth Amendment privilege as to these questions. I find that he did. As to the questions identified, Belcik asserted the privilege on a question-by-question basis at the compliance meeting with the revenue agent, and he confirmed this assertion at the

*Argomaniz* hearing before me (*see* doc. 64). *See Argomaniz*, 925 F.2d at 1356.

### b. Fifth Amendment does not apply

On the other hand, Belcik's Fifth Amendment assertions are not substantiated as to questions 15, 18, and 39. Questions 15 and 18 are:

15. Do any children live with you at your home, located at 1551 Eastlake Woodlands Parkway?
18. Do you possess or have you ever possessed a Passport that was issued to you by the government of the United States of America?

As to these questions, I find that Belcik's answers would be unrelated to the elements of the offenses for which he fears prosecution. Whether Belcik's children live with him and whether he possesses a U.S. passport have no bearing on whether he had income, was required to file a tax return, knew that he was required to file a tax return, or conspired with others to commit the crime. Accordingly, the Fifth Amendment does not protect Belcik from answering these questions.

Question 39 is:

39. Have either of your children (daughters and son) ever applied for federal or state financial aid or a scholarship related to their attendance at any college or university?

This question asks about his children's applications for student financial aid. If Belcik completed and signed his children's FAFSA forms (or any state equivalent), he did so voluntarily and in a non-accusatorial setting. Courts hold that an individual cannot assert the Fifth Amendment as to voluntarily-created, pre-existing documents. *See Garner v. United States*, 424 U.S. 648, 655-56 (1976).

*3. documents*

In question 42, the government asks: "At this time, do you have any records to provide in response to the summons?" The summons asked for the usual items for the 2008-2013 tax years.[13] At the compliance meeting, the agent asked Belcik if he had brought these documents with him (question 42). As already noted, he did not, and he did not bring them to the *in camera* hearing, although he remarked that he did not possess records for 2008 and 2009. I do not credit his statement for the reasons previously stated.[14] Nonetheless, I continue to the next prong of the analysis, which is where Belcik's argument falls apart.

As for the documents, Belcik relies on the Fifth Amendment's act of production

---

[13] The summons demands: "All books, papers, records, and other data in your possession, custody or control reflecting the receipt of income by you for the years ended December 31, 2008, December 31, 2009, December 31, 2010, December 31, 2011, December 31, 2012, and December 31, 2013, including but not limited to: records of deposits to bank accounts, cancelled checks, and check registers for the years 2008, 2009, 2010, 2011, 2012, and 2013; all bank statements and brokerage statements for accounts which you have signature authority for the period from December 2007 to January 2014; Books of accounting to include sales registers, check registers, general registers, general ledgers, special and sub ledgers, general journals, purchase journals, adjusting journals, financial statements. Copies of any and all State of Florida, Department of Revenue, Sales and use Tax Forms filed, copies of any and all Florida Local Sales and use Tax Forms, and copies of any other State tax jurisdiction Sales and Use Tax Forms filed for the period from December 2007 through January 2014." (doc. 1-2).

[14] Alternatively, if Belcik previously his raised Fifth Amendment protection as to this question for the 2008 and 2009 tax years, he has now abandoned that assertion. *United States v. St. John*, No. 8:11-MC-99-T-27MAP, 2013 WL 1610833, at *3 (M.D. Fla. Mar. 18, 2013), report and recommendation adopted, No. 8:11-MC-99-T-27JDW, 2013 WL 1624216 (M.D. Fla. Apr. 15, 2013).

privilege (*see* doc. 98).[15] Namely, by producing the documents in compliance with the summons, he would be establishing the existence of them as well as verifying that he has the documents in his possession. *See Argomaniz*, 925 F.2d at 1356 (quoting *Doe v. United States*, 487 U.S. 201, 209 (1987)). "He would actually be informing the government that he had income in the years in question yet failed to file income tax returns. This act of production would be sufficiently testimonial and incriminating to activate [Belcik's] fifth amendment privilege." *Id.*

This is well and good, but the rule in this circuit for decades required Belcik to do more. A blanket refusal to produce records, which is what Belcik has done, is not enough. *Id.* To avail himself of the privilege's consideration, he had to "'present himself with his records for questioning, and as to each question and *each record* elect to raise or not raise the defense.'" *Id. (*quoting *United States v. Roundtree*, 420 F.2d 845, 852 (5th Cir. 1969)) (emphasis added). Belcik had six chances to produce his responsive documents; three of these were *in camera* proceedings designed to protect his confidences (*see* docs. 2, 15, 35, 49, 73, and 100). *Zolin*, 491 U.S. at 569. He produced no privilege log. He failed to bring a single document. And he failed to properly invoke the privilege as to the documents the summons demanded he produce. *Argomaniz*, 925 F.2d at 1353. By refusing to produce the documents, Belcik has waived his Fifth Amendment privilege as to them. *United States v.*

---

[15] Belcik seems to rely solely on the act of production; if his argument is that the contents of the documents are incriminating, the Fifth Amendment does not apply. *See Argomaniz*, 925 F.2d at 1355-56; *St. John*, 2013 WL 1610833, at *5.

*Grable*, 98 F.3d 251, 257 (6th Cir. 1996).

   D.  Purgation

Belcik's reasons for not complying with the summons, at least as limited here, are unjustified. He has not purged his contempt. The District Judge's finding of contempt stands.

   E.  Conclusion

For the foregoing reasons, it is hereby ORDERED:

1. The District Judge's finding of contempt remains in effect as Respondent Belcik has not purged his contempt of court as to questions 15, 18, 39, and as to his production of the documents the summons commanded him to produce (doc. 1-2).[16]

2. Respondent Belcik is directed to meet with IRS revenue agents at the time and place of their choice (but no later than August 22, 2016) and give testimony and bring for examination the documents described in the summons.

3. Respondent Belcik's conditions of release (doc. 92) that this Court set on April 25, 2016, are hereby modified to require (1) that Belcik meet with IRS revenue agents as this Order directs and (2) that Belcik give testimony and produce the documents as this Order directs.

4. The government is directed to file a notice within five business days after the revenue agents' meeting with Respondent Belcik informing the Court as to whether Belcik

---

[16] *See* footnote 13, *supra*.

has complied with this Order and discharged his contempt. If Respondent Belcik fails to appear at the meeting with the revenue agents or otherwise fails to comply with this Order, this Court will revoke his conditions of release, issue a warrant for his arrest, report to the District Judge that he has not discharged his contempt, and recommend that he remain incarcerated until such time as he purges himself of the contempt.

     5. The District Judge's Order of May 7, 2015 (doc. 15 at 3), required Belcik to "pay the United States' cost in prosecuting this action." When it files its notice as directed in paragraph 4, the government is to indicate whether Belcik has satisfied his obligation under the May 7 Order.

     IT IS SO ORDERED in Tampa, Florida on July 20, 2016.

*Mark A. Pizzo*
MARK A. PIZZO
UNITED STATES MAGISTRATE JUDGE